IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

REALTY INTERNATIONAL ASSOCIATES,

    Plaintiff,

                                                                        Civil No. 12-116 MV/LFG

    v.

CAPITAL FUND SECURITIES, Limited, a
foreign corporation,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion and Brief for Summary Judgment [Doc. 76]. The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that the motion is well-taken and will be granted.

### BACKGROUND

This case involves wraparound transactions on five apartment projects in New Mexico, each of which is owned by a separate limited partnership and is subject to a mortgage. The managing general partner of each limited partnership is Monarch Properties, Inc. Plaintiff Realty International Associates ("Realty") and Defendant Capital Fund Securities, Limited ("CFS") each have interests in the apartment projects pursuant to a series of All Inclusive Residual Notes (the "Notes") – one for each project – under which CFS and Realty, among others, are eligible to receive distribution income.

Originally, an individual named Hugh Pike, the principal of Realty, owned all of the Notes, but then syndicated them, granting participation rights to others. Pike subsequently assigned his interest in the Notes to Black Acre Land Company, which changed its name to RIA Land

1


Company, and ultimately fell into receivership.  CFS subsequently purchased RIA Land Company's interest in the Notes.

A dispute then arose as to what parties held what rights under the Notes.  To resolve that dispute, in 2003, Realty and CFS, among others, entered into an Agreement Regarding Ownership, Participation, and Distribution from Promissory Notes (the "2003 Agreement").  The 2003 Agreement identified CFS as the "holder" of the Notes.  Doc. 5-1 ¶ 2.  Pursuant to the 2003 Agreement, CFS, as the holder of the Notes, granted Realty participation rights in the Notes, which rights allowed Realty to receive distribution income from the apartment projects, in accordance with a distribution schedule attached to the 2003 Agreement.  *Id.* ¶¶ 3-4.  The Agreement also sets forth the parties' "desire" to "refinance the first mortgages of each of the [apartment projects] and to distribute the proceeds from the refinancing, sale, or cash flow in proportion to each party's ownership interest in the Notes."  *Id.* Recital A.

The 2003 Agreement sets forth the terms for the refinancing of the existing mortgages on the apartment projects.  Specifically, the 2003 Agreement provides that "[t]he existing mortgages shall be replaced with new mortgages at a loan to value, as mutually agreed by the parties, as the value is determined by a current appraisal."  Doc. 5-1 ¶ 4(b).  Further, the 2003 Agreement provides that "[t]he parties agree that refinancing of the existing mortgages shall be undertaken for the benefit of the holder of the Notes and to the extent permitted by the lender, the new loans shall be made for, on behalf of, or in the name of the holder of the Notes."  *Id.* ¶ 4(d).

Pursuant to the 2003 Agreement, the parties appointed Pike as their representative "to negotiate with [Monarch,] the general partners of the limited partnership owning the apartment projects for the purpose of having the first mortgages on the [] apartment projects refinanced,

provided, however, all distribution participants have final signatory approval of such negotiations." *Id.* ¶ 5.

In 2004, all of the existing mortgages on the apartment projects were refinanced, with maturity dates in 2011. In connection with the 2004 refinancings, on June 28, 2004, Monarch drafted letter agreements, signed by all of the Note interest holders (including Realty and CFS) (the "Estoppel Letters"), for each of the apartment projects. The Estoppel Letters, each of which is substantially the same, provide that, on or before the 2011 maturity of the 2004 loans, the interest holders will either: (1) repay the refinancing loan in full by obtaining new financing; or (2) modify the terms of the refinancing loan to extend the due date. Doc. 72-2 ¶ 9. The Estoppel Letters further provide that, in the event the interest holders fail to either repay the refinancing loan or modify the terms of the loan to extend the due date, then the interest holders authorize the relevant limited partnership in the "name, place and stead" of the interest holders to either: (1) repay the refinancing loan in full by obtaining new financing, or (2) modify the terms of the refinancing loan to extend the due date. *Id.*

In 2011, when the refinancing loans became due, Realty and CFS both wanted to refinance, but disagreed on the terms that the refinancing should take. Specifically, Realty wanted to refinance the loans so as to lower the interest rate, extend the term, and increase the principal balance of the mortgages. On the other hand, CFS wanted to refinance the loans so as to lower the interest rate and extend the term, but keep the same monthly payments without increasing the principal balance of the mortgage. On July 27, 2011, CFS, through its attorney, sent a letter to the lender, New Mexico Bank & Trust, copied to John Autry at Monarch, stating that CFS desired to have the lender "modify the terms of the loans by extending the maturity date a further seven years and reducing the interest rates on all loans from 7.5% to a rate between 5.75% and 6.25% to reflect

current market conditions. . . . CFS does not wish to borrow any new funds in excess of the existing balance of $1,926,317." Doc. 5-2.  Ultimately, CFS, Realty, and the other interest holders failed to act to either repay the 2004 mortgages in full by obtaining new financing or modifying the terms of the 2004 mortgages.  Monarch, as managing partner of the relevant limited partnerships, acted pursuant to the 2004 Estoppel Letters to refinance the mortgages on the apartment projects.

In February 2012, Realty commenced this breach of contract action against CFS.  In its Amended Complaint, Realty alleges that CFS breached the 2003 Agreement: (1) "by causing its attorney to inform New Mexico Bank & Trust that CFS did not want to refinance the five identified mortgages for an amount in excess of the existing mortgages;" and (2) "because CFS prevented refinancing of the existing mortgages to be undertaken for the benefit of the holders of the notes which included Realty." Doc. 5 ¶ 13.  On January 22, 2014, CFS filed the instant motion for summary judgment in its favor as to all claims asserted in the Amended Complaint. Doc. 76.  Twelve days later, Realty filed a motion seeking discovery prior to responding to the summary judgment motion.  Doc. 78.  The Court granted Realty's motion on April 14, 2014. Doc. 86.  Subsequently, on August 13, 2014, Realty filed its response in opposition to summary judgment.  Doc. 90.  CFS filed a reply on September 2, 2014.  Doc. 91.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

CFS argues that both of Realty's theories for its breach of contract claim fail as a matter of

law on the undisputed facts.   The Court agrees.

As noted above, Realty first alleges that CFS breached the 2003 Agreement by having its attorney inform the lender that CFS did not want to refinance the 2004 mortgages to increase the principal amount.   There is no provision, however, in the 2003 Agreement prohibiting CFS from informing the lender of its desire not to increase the principal amount of the mortgage.   While the 2003 Agreement does contain a provision appointing Pike as the interest holders' representative to negotiate with Monarch, nothing in that provision, or any other, prohibits CFS, or any of the interest holders, from communicating to the lender, or even to Monarch, its desired refinancing terms.

In his deposition, Pike testified that it was "implied" in the 2003 Agreement that CFS was prohibited from contacting the lender.   The law, however, is clear that, "absent an ambiguity, a court is bound to interpret and enforce a contract's clear language and cannot create a new agreement for the parties."   *Montoya v. Villa Linda Mall, Ltd.*, 746 P.2d 258, 259 (1990).   Here, the 2003 Agreement is clear and unambiguous.   Because it contains no provision prohibiting CFS from communicating with the lender, the Court may not construe or interpret the 2003 Agreement to contain any such provision.   *Richardson v. Farmers Ins. Co.*, 811 P.2d 571, 572 (1991) (where a contract is clear and unambiguous, its provisions "need only be applied, rather than construed or interpreted").   Accordingly, as a matter of law, CFS could not, and thus did not, breach the 2003 Agreement by informing the lender that it did not want to refinance the apartment project mortgages for an amount in excess of the existing mortgages.

Realty next alleges that CFS breached the 2003 Agreement by preventing refinancing of the existing mortgages to be undertaken for the benefit of the holders of the notes, which holders included Realty.   Realty, however, is not a "holder of the notes."   To the contrary, the 2003

Agreement defines CFS as the sole "holder" of the Notes.  Realty, in contrast, holds a participation right that entitles it to receive from the apartment projects distribution income in accordance with a set distribution schedule.  The 2003 Agreement plainly states that "refinancing of the existing mortgages shall be undertaken for the benefit of the holder of the Notes," which was CFS.  There is nothing in the 2003 Agreement to suggest that anyone other than the holder of the Notes itself was given the power to determine what refinancing terms would be in CFS's own benefit.  Accordingly, even assuming, arguendo, that CFS prevented a refinancing of the existing mortgages for Realty's benefit, as a matter of law, such action could not, and thus did not, breach the 2003 Agreement.

In its response to Defendant's motion, Plaintiff clarifies the bases for its breach of contract claim, arguing that CFS violated the 2003 Agreement by:  (1) interfering with Pike's ability to negotiate with the general partners of the limited partnerships; and (2) failing to agree to the new mortgage proposed by Pike.  Defendant argues in its reply that the undisputed evidence shows that none of CFS's actions, as described in Plaintiff's response, violated any provision of the 2003 Agreement.  The Court again agrees with Defendant.

First, Plaintiff argues that CFS "started negotiations" with Autry, the individual representing Monarch, "as to what CFS wanted from refinancing."  These negotiations, Plaintiff argues, "interfered with Mr. Pike's ability to negotiate with Mr. Autry."  Plaintiff, however, fails to mention that CFS communicated with Autry only in response to a refinancing proposal that he sent to all of the interest holders.  Specifically, Autry testified that after he sent out a matrix to all of the parties, CFS "came back" and indicated that it did not "want to draw additional money." Doc. 90-2.

The 2003 Agreement contains no provision prohibiting any of the distribution participants,

including CFS, from responding to Monarch's refinancing proposals.   Indeed, the 2003 Agreement gave "all distribution participants . . . final signatory approval" of Pike's negotiations with Monarch.   CFS thus was acting within its contractual rights in communicating its refusal to accept the refinancing proposal that resulted from Pike's negotiations with Monarch.

Further, Plaintiff has provided no evidence to support its claim that CFS's communication with Monarch, made after Monarch had already devised and disseminated a refinancing proposal, interfered in the first instance with Pike's ability to negotiate with Monarch.   To the contrary, Pike's negotiations resulted in a refinancing proposal from Monarch to borrow a combined $1,080,000, which is the refinancing that Pike desired.   CFS's communication could not have interfered, after the fact, with Pike's negotiations.

Next, Realty argues that the original intent of the parties to the 2003 Agreement was "to refinance mortgages for the maximum amount whenever possible."   According to Realty, this original intent is evidenced by the fact that multiple refinancings occurred between 2003 and 2011 for the maximum amount possible.   Realty's argument ignores the plain language of the 2003 Agreement, which states that existing mortgages would be replaced with new mortgages "at a loan to value, as mutually agreed by the participants, as the value is determined by a current appraisal."[1] While the "value" was to be determined by a current appraisal, the "loan to value" was not a fixed or objective percentage, but rather was to be "mutually agreed by the participants."

The 2003 Agreement thus memorializes the parties' intent that the loan to value be mutually agreed by the participants.   Given the clear and unambiguous language of the 2003 Agreement, the Court cannot construe or interpret the agreement to reflect an alternate intent, *i.e.*,

---

[1] "Loan-to-value" ("LTV") is a percentage figure that reflects the mortgaged portion of the property and the equity portion of the property.   For example, a mortgage of $150,000 on a property that is worth $200,000 reflects a LTV of 75%, with $50,000 in equity.

that the parties agreed in advance always to accept the maximum possible loan to value.  *Ponder v. State Farm Mut. Auto. Ins. Co.*, 12 P.3d 960, 964 (N.M. 2000) ("When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves.").   Even assuming, arguendo, that after execution of the 2003 Agreement the parties agreed multiple times to refinance other mortgages at the maximum possible loan to value, this subsequent conduct provides no basis for the Court to read into the 2003 Agreement an intent that is not therein memorialized and that in fact contravenes its clear and unambiguous language.

The 2003 Agreement gives CFS the right to disagree as to a proposed loan to value ratio, and to withhold final signatory approval of any refinancing proposal negotiated between Pike and Monarch.  Nothing in the 2003 Agreement obligated CFS to agree to a certain loan to value ratio or to a certain refinancing proposal, simply because it would benefit Realty.  By the same token, nothing in the 2003 Agreement entitled Realty to a refinancing at the maximum possible loan to value ratio, or to CFS's approval of a refinancing on the terms believed by Realty to be most beneficial.  Accordingly, CFS could not, and thus did not, breach the 2003 Agreement by preventing the refinancing of the apartment projects for an additional $1,080,000.

## CONCLUSION

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment [Doc. 76] is GRANTED.

DATED this 24th day of September, 2014.

_____
MARTHA VÁZQUEZ
United States District Judge